IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| D.H., an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No.: _____ (  ) |
| v. | ) | |
| | ) | *Plaintiffs Demand* |
| SHREEJI ENTERPRISES, LLC; | ) | *a Trial by Jury* |
| KS ENTERPRISES OF CHARLOTTE, INC.; | ) | |
| AND SUPER 8 WORLDWIDE, INC.; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Matthew B. Stoddard
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com

**Attorney for Plaintiff**

# TABLE OF CONTENTS

I.      Introduction..................................................................................................3

II.     Procedural Issues and Parties.......................................................................8

III.    Facts...........................................................................................................12

        A.  Plaintiff's Trafficking…………….............................................................12

        B.  Information Regarding the Motel, and Plaintiff's
            Experience Not Being Unique..............................................................17

        C.  Policies and Procedures that Facilitated Plaintiff's and
            Others' Sex Trafficking.......................................................................20

        D.  Industry Knowledge............................................................................23

        E.  Defendants' Knowledge as to Plaintiff.................................................27

IV.     Count 1: TVPRA Civil Beneficiary Claims.................................................31

V.      Count 2: Premises Liability Law................................................................34

VI.     Causation And Damages...........................................................................36

VII.    Jury Trial..................................................................................................38

VIII.   Prayer For Relief......................................................................................38

# I. INTRODUCTION

1.

This case involves the sex trafficking of a minor – namely Plaintiff D.H. – at a notorious Charlotte motel in 2014.

2.

The motel at-issue is the Super 8 by Wyndham Charlotte/Amusement Park Area or Super 8 Motel, located at 11300 Texland Blvd., Charlotte, NC 28273 (the "Motel", the "Charlotte Super 8" , or "Defendants' Motel").

3.

At all relevant times to this Complaint, the Charlotte Super 8 was a known hotspot for drugs, prostitution, sex trafficking, and violent crime.

4.

Defendants were particularly aware that the back door of their hotel and back parking lot were used for drug sales and as a place to purchase commercial sex during, prior to, and after Plaintiff's trafficking.

5.

Defendants were aware of their reputation.  Despite this, instead of taking action, Defendants chose to do nothing; thereby creating a safe space for those seeking to commit crimes without fear of detection or consequence.  Defendants then profited off the increased room rentals this system created (i.e. creating a safe space for drug trafficking, human trafficking, commercial sex, and other crime).

6.

At all relevant times, Shreeji Enterprises, LLC; KS Enterprises of Charlotte, Inc.; and Super 8 Worldwide, Inc. (collectively "Defendants") jointly owned, operated, and managed the Charlotte

3

Super 8 (i.e., upon information and belief, Defendants hired and trained staff; implemented policies and procedures; owned the land and Motel; and ran the day-to-day operations, etc.).

7.

Upon information and belief, Defendants were warned on numerous occasions prior to and during Plaintiff's trafficking by law enforcement, news agencies, Motel patrons, and the overwhelming and unignorable presence of crime at the Charlotte Super 8 that said location was a haven for drugs, prostitution, sex trafficking, and other violent crime.

8.

 Given the above, Defendants knew or should have known that changes had to be made at the Charlotte Super 8.  However, instead of contacting law enforcement, hiring appropriate security, or taking other reasonable measures to deter crime, Defendants chose to profit from the room revenues brought in by those seeking to commit crime(s) and provide cover for criminals seeking a place free of repercussion(s).

9.

As a direct and foreseeable result of Defendants' actions and inactions, the then-minor Plaintiff in this case was brought to Defendants' Motel to be trafficked, beaten, threatened, and repeatedly raped from 10 to 20 times a day for approximately five (5) to six (6) continuous weeks in 2014.

10.

Defendants had every reason to know about what was happening to this specific Plaintiff and that it was facilitating her trafficking – in addition to other women.  For instance, during D.H.'s time at Defendants' Motel:

4

a. Plaintiff was 16 years old. She had little to no belongings and was always dressed in provocative, age-inappropriate clothing.

b. Plaintiff accompanied her trafficker to the front desk area where her trafficker would pay for a room or rooms at Defendant's Motel using the cash that Plaintiff generated through commercial sex acts.

c. Plaintiff recalls being placed at the back of Defendants' Motel and having the back door be used to bring "Johns" in and out of the Motel, a fact that Defendants' staff was well aware of from seeing said acts in person, viewing on cameras, and from guests' review and complaints.

d. The purpose of placing Plaintiff, her trafficker, and those Defendants' staff suspected of drug and sex related crimes at the back of the Motel was to prevent their detection, make them feel accommodated, to keep said suspicious guests from disturbing more family and legitimate business-oriented guests, and to allow an ease of access for "johns" and drug buyers/sellers a way in and out of the Motel.

e. In addition to the above, Plaintiff accompanied her trafficker to Defendants' front desk no fewer than three (3) occasions during her weeks long-stay at Defendants' Motel.

f. During those instances where Plaintiff D.H. would accompany her trafficker to Defendants' front desk, she would be wearing provocative clothing; appear to be 16 years old; be forced to keep her head and eyes down while in the presence of hotel staff; stayed quiet and displayed signs of physical abuse (i.e. bruising and avoidance of interaction); have little to no belongings; was under the influence of drugs and alcohol such that she would sway, stumble, appear dazed, and/or glossy-eyed; and was

accompanied by other girls or women that displayed the same tendencies – all whilst being accompanied by an older man and/or pimp who appeared to be in his mid-30s.

g.  On those occasions where Plaintiff would see her trafficker interact with hotel staff, they were friendly.

h.  During Plaintiff's stay at Defendants' Motel, her trafficker would refuse housekeeping services for days to about a week or more on end.

i.  Though they did not get housekeeping services, Plaintiff's trafficker would request new towels and sheets multiple times per day, every day, and – at her trafficker's request – said towels and sheets would either be either left at the room's door or picked up in the lobby.

j.  Because housekeeping had been forgone for days or weeks at a time, Plaintiff's trafficker would leave behind trash can(s) full of used condoms, empty bottles of lube, and piles of towels and sheets from their frequent requests.  These items would be observed by housekeeping after days and weeks of build-up.

k.  Plaintiff's trafficker would arrange for 10 to 20 men per night to come to Defendants' Motel for short periods of time of under an hour to have sex with D.H.

l.  This high traffic volume Plaintiff generated was observed by Defendants' staff via their camera system and by Defendant' staff witnessing cars coming and going from the property in large volumes, with quick, less than an hour turn around, and never having checked in at the Motel.

m.  In addition to Plaintiff, Plaintiff's trafficker had at least one other minor victim under his control during D.H.'s time at Defendants' Motel who created similar volumes of traffic of men coming and going multiple times an hour for days and weeks on end

6

and displayed similar – if not, identical – "red flags" as those described above for Plaintiff.

n. The trafficker would loudly beat, threaten, bruise, and argue with Plaintiff such that Motel employees and others could hear said events and see her injuries.

o. The trafficker would regularly and repeatedly wait outside Plaintiff's room or in the parking to collect money from "johns" visiting Plaintiff for sex, which was observed by Defendants' staff.

p. Despite the above, Defendants repeatedly rented rooms to Plaintiff's trafficker for days to about a week at a time, which ,through room renewals, went on for approximately five (5) to six (6) weeks – all whilst observing the above and sending Plaintiff to the back of their Motel.

q. The end result of the above was that Plaintiff's trafficker and Defendants entered into an understood agreement whereby Defendants provided a safe space for the sale of drugs and sex, and Plaintiff's trafficker would continue to rent rooms from Defendants – thus creating profit for all involved.

11.

In short, Defendants profited not just from the room rentals of the general criminal element it attracted with their policies, but Defendants also knew or should have known that it was profiting from the sex trafficking of this then-minor Plaintiff. Despite their knowledge, for weeks Defendants continued to rent Plaintiff's trafficker a safe space to operate and that catered to his needs (i.e. a place where he could conduct his business free of repercussions and where "johns" knew where to find him). Defendants even went so far as to continue to rent rooms to the trafficker after sending Plaintiff to the back of the Motel. In exchange, Defendants' Motel room(s) were

occupied more often than they otherwise would be, thus creating profit due to the consistent, repeat business. This tacit agreement or understanding with Plaintiff's trafficker was a system that was so prevalent between Defendants that Defendants' Motel became a known, repercussion-free one stop shop for drugs and commercial sex. It is for these reasons and those stated above and below that Defendants are liable for Plaintiff's damages under 18 U.S.C. § 1595(a) (the "TVPRA") and North Carolina's common law premises liability.

## II. PROCEDURAL ISSUES AND PARTIES

### A. Plaintiff D.H.

12.

Given the nature of the case, D.H. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed full names to defense counsel or will immediately upon identification of defense counsel. When filing this Complaint, or upon Defendants filing an Answer, Plaintiff's Counsel also filed – or will file – a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously after conferring with Defense Counsel as required by local rule.

13.

D.H. is a natural person who is currently a resident and citizen of the State of Michigan.

### B. Defendant Shreeji Enterprises, LLC.

14.

Defendant Shreeji Enterprises, LLC is a North Carolina limited liability company that has jointly owned, operated, and managed the Charlotte Super 8 since approximately 2000.

15.

Defendant Shreeji Enterprises, LLC maintains their principal place of business at 11300 Texland Blvd., Charlotte, NC 28273.

16.

Defendant Shreeji Enterprises, LLC regularly conducts business in the state of North Carolina, derives substantial revenue from services rendered in North Carolina, and has committed tortious acts and omissions within Mecklenburg County, North Carolina, including but not limited to, at the Charlotte Super 8.

17.

Defendant Shreeji Enterprises, LLC's registered agent is "H.K. Patel" who may be served at 11300 Texland Blvd., Charlotte, NC 28273 as listed and registered on the North Carolina Secretary of State's website. Defendant may be served through said registered agent.

18.

Defendant Shreeji Enterprises, LLC may be served through one of their managers or any of its members, including but not limited to: Nayan Patel, H.K. Patel, and S.K. Patel.

19.

Defendant Shreeji Enterprises, LLC was properly served with process in this matter.

20.

Defendant Shreeji Enterprises, LLC is subject to the jurisdiction and venue of this Court.

## C. <u>Defendant KS Enterprises of Charlotte, Inc.</u>

21.

Defendant KS Enterprises of Charlotte, Inc. is a North Carolina corporation that has jointly owned, operated, and managed the Charlotte Super 8 since approximately 2000.

22.

Defendant KS Enterprises of Charlotte, Inc. maintains its principal place of business at 11300 Texland Blvd., Charlotte, NC 28273.

23.

Defendant KS Enterprises of Charlotte, Inc. regularly conducts business in the state of North Carolina, derives substantial revenue from services rendered in North Carolina, and has committed tortious acts and omissions within Mecklenburg County, North Carolina, including but not limited to, at the Charlotte Super 8.

24.

Defendant KS Enterprises of Charlotte, Inc.'s registered agent is "H.K. Patel" who may be served at 11300 Texland Blvd., Charlotte, NC 28273 as listed and registered on the North Carolina Secretary of State's website. Defendant may be served through said registered agent.

25.

Defendant KS Enterprises of Charlotte, Inc. may be served through one of its managers or any of its corporate officers.

26.

Defendant KS Enterprises of Charlotte, Inc. was properly served with process in this matter.

27.

Defendant KS Enterprises of Charlotte, Inc. is subject to the jurisdiction and venue of this Court.

**D. Super 8 Motels, Inc. / Super 8 Worldwide, Inc.**

28.

Defendant Super 8 Worldwide, Inc. is a South Dakota corporation that changed its name *from* Super 8 Motels, Inc. in or about 2008.

29.

Super 8 Worldwide, Inc. is, or essentially is, the same company as Super 8 Motels, Inc.

30.

Super 8 Worldwide, Inc. maintains all the same liabilities, employees, systems, hotels/motels, and contracts as Super 8 Motels, Inc. given they are the same company under a different name.

31.

Super 8 Worldwide, Inc. and Super 8 Motels, Inc. will be referred to singularly as "Defendant Super 8" for the remainder of this Complaint as they are, or essentially are, one in the same.

32.

Defendant Super 8 is a South Dakota corporation that has jointly owned, operated, and managed the Charlotte Super 8 since approximately 2000.

33.

Defendant Super 8 maintains its principal place of business at 22 Sylvan Way, Parsippany, NJ 07054.

34.

Defendant Super 8 regularly conducts business in the state of North Carolina, derives substantial revenue from services rendered in North Carolina, and has committed tortious acts and omissions within Mecklenburg County, North Carolina, including but not limited to, at the Charlotte Super 8.

35.

Defendant Super 8's registered agent is Corporate Creations Network Inc. who may be served at 15720 Brixham Hill Avenue, #300, Charlotte, NC 28277 as listed and registered on the North Carolina Secretary of State's website. Defendant Super 8 may be served through said registered agent.

36.

Defendant Super 8 may be served through any of its managers or corporate officers.

37.

Defendant Super 8 was properly served with process in this matter.

38.

Defendant Super 8 is subject to the jurisdiction and venue of this Court.

39.

Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act ("TVPRA") a/k/a 18 U.S.C. § 1595, *et sec.*, which is/are law(s) of the United States.

40.

Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Mecklenburg County, North Carolina which is within the Western District of North Carolina's Charlotte Division. *See* 28 U.S.C. § 1391.

## III. FACTS

**A. Plaintiff's Trafficking.**

41.

Plaintiff was 16 years old in 2014.

42.

During the timeframe in the Paragraph above, Plaintiff was trafficked for sex by a man she knows as "Travis" (or "Plaintiff's Trafficker") at Defendants' Motel.

43.

Plaintiff believes "Travis" was in his 30s.

44.

Almost immediately after Plaintiff met Travis, Travis began trafficking her for sex.

45.

Travis brought D.H. to the Charlotte Super 8.

46.

Travis kept D.H. at Defendants' Motel for approximately five (5) to six (6) continuous weeks.

47.

At all relevant times, to keep Plaintiff under his control and force her to engage in commercial sex, Travis would use – or threaten to use – acts of violence against Plaintiff D.H., including but not limited to strangling her, hitting her, and throwing objects at her.

48.

In addition to threats and acts of violence to keep D.H. under control and to keep her engaging in commercial sex acts, Plaintiff's Trafficker kept her under a cocktail of alcohol and drugs, which included but was not limited to ecstasy and "molly."

49.

At all relevant times, Travis kept all – or the vast majority – of the money Plaintiff made through engaging in coerced commercial sex acts such that she had no means to live without Travis and felt dependent on him.

50.

Travis, or one of his friends or co-traffickers, would often watch or be within a short distance of Plaintiff such that she felt she was being monitored and could not escape Travis without risking her safety.

51.

At all relevant times, Plaintiff was under the age of 17 while being trafficked at Defendants' Motel.

52.

At all relevant times, Plaintiff's Trafficker would demean her by calling her "bitch," "worthless," and making her think she had nothing and no one. This was done for the purpose of further keeping her under his control.

53.

At all relevant times, Plaintiff stayed in a room near the back of the Defendants' Motel.

54.

Defendants' staff sent Travis, Plaintiff, and his other victim(s) to the back of their Motel for the purpose of avoiding said persons from being detected by either law enforcement or more legitimate, family or business-oriented guests.

55.

Plaintiff accompanied her trafficker to Defendants' front desk on more than one occasion during her weeks long-stay at the Motel.

56.

During those instances where Plaintiff D.H. would accompany her trafficker to Defendants' front desk areas, she would be seen by Motel staff when the following could observed about D.H.:

a.  she would be wearing provocative clothing;

b.  appear to be 16 years old;

c.  be forced to keep her head and eyes down while in the presence of Motel staff;

d.  stayed quiet and displayed signs of physical abuse (i.e. bruising and avoidance of interaction);

e.  was under the influence of drugs and alcohol such that she would sway, stumble, and appear dazed, and/or appear glossy-eyed;

f.  was accompanied by other girls or women that displayed the same tendencies – all whilst being accompanied by an older man and/or pimp who appeared to be in his 30s;

g.  Plaintiff would see Travis interact with Motel staff whom were friendly with one another; and

h.  Plaintiff would witness her trafficker pay for rooms with money she generated through engaging in forced commercial sex acts.

57.

In addition to the above, during her weeks of being trafficked at Defendants' Motel, Defendants were provided numerous other reasons to know about Plaintiff being trafficked. Those reasons include, but are not limited to, the following:

a.  Plaintiff's Trafficker would refuse housekeeping service for days or more than a week at a time.

b. Travis's refusal of housekeeping service as described above often involved refusing housekeeping services for more than one room at a time.

r. Though they often forewent housekeeping entering their room(s) for days or a week or more at a time, Plaintiff's Trafficker would request new towels and sheets multiple times per day, every day, and – at her Trafficker's request – said towels and sheets would either be either left at the room's door or picked up in the lobby.

c. Because housekeeping services were being foregone for days or weeks at a time, there would be a build-up of discarded condoms, lube, and dirty sheets/towels that would be seen by housekeeping when they were allowed in the room or said items were discarded out the door.

d. There were occasions where Plaintiff's Trafficker would yell or beat her or other women such that the noises could be heard by staff.

e. Because Plaintiff was forced to have sex with ten (10) to twenty (20) men per day, her and her Trafficker created a large amount of traffic to and from her room. This traffic was seen by staff watching on Motel cameras, by front desk staff seeing numerous non-guests come and go by the front office in short intervals of an hour or less, and by Motel staff conducting their regular duties around the Motel.

f. In addition to Plaintiff, Travis trafficked other women or girls at Defendants' Motel that created their own similar traffic as Plaintiff. This was witnessed by Motel staff via the same methods described above. Said women or girls presented similar "Red Flags" to Plaintiff as well.

16

s. Plaintiff's Trafficker would regularly and repeatedly wait outside D.H.'s room or in the parking lot to collect money from "johns" visiting Plaintiff for sex, which was seen by Motel staff on camera and in person.

58.

Despite observing the above, Defendants repeatedly rented rooms to Plaintiff's Trafficker for only days or a week at a time, for continuous weeks on end – all whilst keeping Plaintiff at the back of their Motel.

**B. Information Regarding the Motel, and Plaintiff's Experience Not Being Unique.**

59.

Defendants and their employees had been warned by law enforcement, city officials, online reviews, customer complaints, and news reporters about the presence of drugs sales, prostitution, and violent crime on their property – especially in and around the back of their Motel – prior to, during, and after Plaintiff's trafficking periods. For example, actual reviews describing Defendants' Motel include but are not limited to the following:

59(a).



59(b).



59(c).



59(d).



59(e).

| ACchipper<br>wrote a review<br>68 contributions<br><br>Date visited **Sep 2016**<br>Trip type **Solo** | Definitely not what I expected from a Wyndham property.It is run down and really needs to be whipped into shape.<br>First the good stuff. The hotel is easy to find and maybe 2-3 miles from Carowinds.. The bed was fine, but I was VERY tired the three nights I stayed there from being in the amusement park all day. The rooms was a decent size and there was a desk, flat screen TV. Water pressure was good and hot water was adequate. Air conditioning was great.<br>Don't try to check in early, they are having none of it.<br>There is no elevator.<br>The first room I was given had absolutely no electricity in it, No lights no TV no nothing. They moved me to another room. I turned the light on in the bathroom and it was so dim I called them in to repair it. They said nothing was wrong, all the bathrooms are like that. Try putting in contact lenses or putting on makeup under the brightness of what seemed like a a 15-watt light.<br>Free breakfast consists of two varieties of cereal (frosted flakes is one) and some pre-wrapped cinnamon buns. There  was apple juice  but no orange juice all three days I was there.I asked why and they said they didn't have any more. The hot water canister (to make tea) had cold water in it but the attendant did make me some hot water for me.<br>The pillows are awful, just flat little things like you used to get on the airlines but a little bigger. Bring your own. There is no blanket on the bed, just a sheet and a bedspread that easily slips off the bed during the night.<br>I would not stay on the ground floor because the outside back door doesn't  seem to be locked at night and the hotel is on a lonely dark road. |

60.

On those occasions when Plaintiff would be outside her room or passing through the parking lot of Defendants' Motel, she would notice the following, especially at night and on the weekends:

a. Multiple women or pimps soliciting sex on the property.

b. Pimps and drug dealers selling drugs in the parking lot.

c. The smell of marijuana was pervasive throughout both the Motel and parking lot.

d. "Johns" on foot and in cars that would come and go during all hours of the night.

e. According to Plaintiff, the activities described in this Paragraph were so prevalent, that it would be impossible for Defendants' staff and other guests not to notice these activities.

61.

Upon information and belief, the Charlotte-Mecklenburg Police Department notified Defendants of arrests at their property concerning: rape, forcible fondling, and other violent crimes such that Plaintiff's Trafficking and rapes were foreseeable.

62.

Those acts described above demonstrate Defendants' knowledge, notice, and the foreseeability on the issue sex trafficking; demonstrate Defendants' lack of mistake in recognizing those indicators of sex trafficking or the "Red Flags" thereof; demonstrate Defendants' plan and tacit agreement with Plaintiff's trafficker and other criminals to provide and facilitate them with a place that caters to their illicit activities (i.e., by allowing criminals to operate without consequence out of their Motel; not calling the police when suspicious activities are noticed; allowing rooms to go un-entered by housekeeping; allowing high traffic to come and go from rooms; providing Wi-Fi for the solicitation of "johns" and those seeking to purchase drugs; permitting their parking lot to be used as a loitering zone for passersby; turning a blind eye to the smell of marijuana and the irregular, high-volume ordering of towels and sheets; and – amongst other things – promoting policies not consistent with that of a reasonably prudent Motel in exchange for repeated room rentals and increased profit); and demonstrate an indifference to consequences.

**C. Policies and Procedures that Facilitated Plaintiff's and Others' Sex Trafficking.**

63.

For the purpose of facilitating and catering to the criminal element at their Motel – which includes but is not limited to Plaintiff's Trafficker at all relevant times – Defendants engaged in the following behaviors and policies:

a. Defendants continued to rent room to those they knew or should have known were engaged in the sex trafficking, drug sales, and prostitution.

b. Defendants maintained policies and systems whereby they would not call the police on those it knew or should have known were engaged in sex trafficking, drug sales, and prostitution, thereby providing an environment where one could engage in sex trafficking without fear of detection or repercussion(s).

c. Defendants maintained policies and systems whereby housekeeping services could be suspended, thereby allowing traffickers and other criminals to avoid detection.

d. Defendants maintained policies and systems whereby towels and sheets could be dropped off at a guests' door or picked up in the lobby multiple times per day, many days in a row, without question to allow for "johns," pimps, and traffickers' comfort when engaging in commercial sex.

e. Defendants maintained policies and systems whereby their staff would not report the presence of trashcans full of used condoms and empty bottles of lube, women selling themselves, pimps surveilling rooms, and high traffic of non-guests coming and going from the Motel.

f. Defendants maintained policies and systems whereby Defendants did not check all guests' I.D.s at the Motel, thereby allowing women, young girls, and "johns" (by the dozens over weekends) to come and go freely from the Motel, which further facilitated pimps and traffickers to conduct their business and avoid detection.

g.  Upon information and belief, Defendants maintained policies and systems whereby they would allow guests to pay for rooms day-by-day and in cash to cater to the needs of traffickers, who would only deal in cash.

h.  Defendants maintained policies and systems whereby their Wi-Fi could be used to post ads and pictures of women and girls available for sex.  Additionally, Plaintiff would note that she was posted nude on Backpage ads while underaged from Defendants' Motel and, upon information and belief, their Wi-Fi.

i.  Defendants maintained policies and systems whereby staff would not call or report signs of sex trafficking, prostitution, or drug sales for the purpose providing a space wherein those engaged in these activities would come back and rent rooms in order to repeatedly engage in said vices.

j.  Defendants maintained policies and systems whereby staff would steer those suspected of illicit activities to the back of their Motel for the purpose of providing a place where they felt safe from detection and where said persons were less likely to disturb family or legitimate business-oriented guests.

64.

Despite warnings from law enforcement, news reports, customer complaints, city officials, and the presence of overwhelming and apparent crime on the property that included drug sales in the parking lot, pimps monitoring rooms, and women selling themselves in the parking lot, Defendants refused to change their above policies and systems.

65.

Defendants maintained their policies and systems following those warnings described above for the purpose of creating an environment of low disruption and detection for criminality

and to continue to attract and rent rooms to those looking to engaging in illegal activity (like sex trafficking, drug use, and prostitution) – and thus profiting from said rooms rentals.

66.

By Defendants maintaining the above policies and systems and providing Plaintiff's Trafficker a room (or rooms) over and over again – despite those warnings and "red flags" described above, both general and specific to Plaintiff – Defendants facilitated Plaintiff's (and others) trafficking by providing a venue that catered to Plaintiff's Trafficking, which Defendants knew or should have known about.

67.

By Defendants maintaining the above policies and systems and providing Plaintiff's Trafficker a room (or rooms) over and over again – despite those warnings and red flags described above, both general and specific to Plaintiff – and providing a venue that catered to Plaintiff's Trafficking, Defendants entered into a tacit agreement with Plaintiff's Trafficker whereby Defendants provided a venue that facilitated Plaintiff's Trafficking and, in exchange, Defendants profited from Plaintiff's Trafficking/Trafficker through repeated and increased room rentals.

**D. Industry Knowledge.**

68.

Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

69.

Defendants knew or should have known of the existence and prevalence of sex trafficking

at budget motels and its illegality since the passage of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*., and publishing of the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, which was also passed in 2000.

70.

Defendants knew or should have known that in 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—benefit from participation in a venture that they know or should know engages in sex trafficking.

71.

Defendants knew or should have known that, compared to other types of businesses, hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

72.

In 2010 the Department of Homeland Security ("DHS") issued the guidance to hotel companies, entitled Human Trafficking and the Hospitality Industry,[1] which identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to,

---

[1] https://www.dhs.gov/blue-campaign/hospitalityindustry.

signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, and the presence of multiple computers or cell phones. Defendants knew or should have known of these warning signs and indicators.

73.

The End Child Prostitution and Trafficking (ECPAT-USA) published a list of indicators of human trafficking for hotel staff to recognize and combat trafficking, such as: paying for rooms using cash, paying for multi-day stays one day at a time, escorting various men into the room and lingering until they leave, watching the door, room being frequented by different men, insisting on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings. Defendants knew or should have known of these warning signs and indicators.

74.

DHS has also previously provided education and guidance for the hospitality industry under the Blue Campaign, because of the hospitality industry' unique situation to identify and prevent sex trafficking. Said guidance includes having hotel staff be vigilant for the following:[2]

    a.    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b.    persons who lack freedom of movement or are constantly monitored;

    c.    persons who have no control over or possession of money or ID;

---

[2] https://www.dhs.gov/blue-campaign/publication/blue-campaign-toolkits-and-guides.

d.      persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.      requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f.      the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.      extended stay with few or no personal possessions in the room;

h.      excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.      the same person reserving multiple rooms;

j.      a room is rented hourly, less than a day, or for an atypical extended stay;

k.      attempts to sell items to or beg from patrons or staff;

l.      cars in the parking lot regularly parked backward, so the license plates are not visible;

m.      loitering and solicitation of male patrons; and

n.      persons asking staff or patrons for food or money.

Defendants knew or should have known of these warning signs and indicators.

75.

Defendants knew or should have known that commercial sex in a hotel environment, involving a "pimp," often involves sex trafficking.

76.

At all times relevant to this Complaint, the hospitality industry, which includes Defendants' Motel(s), knew or should have known about their unique status to observe sex trafficking and the common signs thereof.

77.

At all times relevant to this Complaint, the hospitality industry, which includes Defendants' Motel(s), knew or should know to implement reasonable training, policies, and procedures to observe for signs of sex trafficking.

78.

At all times relevant to this Complaint, the hospitality industry, which includes Defendants' Motels, knew or should know to be vigilant for the above signs of sex trafficking and to take reasonable measures against the same (e.g. hire security, create policies of reporting crime, not accepting cash payments for rooms, training staff to notice signs of sex trafficking, requiring I.D. for all guests, implementing card readers, and implementing policies whereby housekeeping must enter rooms after 48 hours and place new sheets and towels in rooms).

79.

Defendants knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

80.

At all relevant times, Defendants knew or should have known that there was a heightened risk that sex trafficking could take place at their facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that motels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that low income motels were a particular hotbed of sex trafficking, and (iii) the general nature of Defendants' business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

**E. Defendants' Knowledge as to Plaintiff.**

81.

Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Motel at all relevant times, giving Defendants specific and direct knowledge of sex trafficking, including the sex trafficking that victimized D.H., and other crimes at the Motel during the relevant period.

82.

Defendants utilized, monitored, and reviewed cameras at the Motel at all relevant times during the Complaint.

83.

Defendants and their employees were warned by law enforcement, city officials, online reviews, customer complaints, and news reports about the high presence of drugs sales, prostitution, and violent crime at their Motel prior to Plaintiff's trafficking period such that they should have been able to recognize Plaintiff's situation when they saw it.

84.

Defendants knew and should have known of other women displaying the same signs of trafficking at their Motel prior to Plaintiff being there. However, Defendants similarly profited from said women.

85.

Defendants knew and should have known that Plaintiff displayed the following signs of sex trafficking at all times relevant to this Complaint:

a. Plaintiff would not interact with Defendants' staff and would keep her head down when in view of Defendants' employees;

b. Plaintiff was dressed provocatively for her age and appeared under aged;

c.  Plaintiff appeared bruised and scarred in addition to being underaged and dressed provocatively while in the presence of Defendants' employees;

d.  Plaintiff would appear under the influence of drugs and alcohol (i.e. glossy-eyed, smelling of marijuana, and swaying) while in the presence of Defendants' employees;

e.  Plaintiff and her trafficker would go days or weeks without housekeeping services;

f.  Despite foregoing housekeeping services, Plaintiff's trafficker would request towels and sheets multiple times a day, every day that had to either be left at the Motel room door or picked up by Plaintiff's trafficker in the lobby;

a.  Because housekeeping had been forgone for days or weeks at a time, Plaintiff's trafficker would leave behind trash can(s) full of used condoms and empty bottles of lube upon housekeeping gaining entry to the room after days or weeks;

b.  Plaintiff's trafficker would arrange for 10 to 20 men per night to drive past the front office in clear view of Defendants' employees, park in the parking lot, stay at Defendants' Motel less than an hour while they had sex with D.H., before once again leaving the property with Defendants' full knowledge via camera, reports employee witnesses, and customer complaints;

c.  Plaintiff's trafficker would rent multiple rooms, forgo housekeeping in all of them, renew them with cash after short period of time, and monitor said rooms while men came and went, which was seen by Motel staff on camera and in person;

d.  Plaintiff's trafficker would become angry and abusive towards Plaintiff, and the two would yell at each other or fight such that they would be loud, throw things and damage the room, and simply act and yell in a manner that others, including Motel staff, could hear; and

e.  Upon suspecting Plaintiff's Trafficker of prostitution or other illegal activities, Defendants sent Plaintiff to the back of their Motel.

86.

Defendants knew and should have known that their Motel was the subject of:

a.  Pimps and women soliciting sex on their property;

b.  People selling drugs in the parking lot;

c.  The smell of marijuana was pervasive throughout both the motel and parking lot;

d.  Cars with "johns" coming and going from the Motel and spending less than an hour at the Motel during all hours of the night.  This was not limited to those men coming to have sex with Plaintiff.  Rather, other women were also sold at the Motel, which – in addition to drug sales – created a high traffic environment that no one could miss.

87.

Defendants knew and should have been aware that the above are signs of trafficking in the hospitability industry such that they knew or should have known of Plaintiff's trafficking.

88.

Defendants knew and should have known – upon information and belief – that there were reviews online and customer complaints stating there are drug sales at the Motel and pimps and women soliciting sex openly on the premises.

89.

Defendants knew and should have known about the high amount of prostitution and drug sales at their Motel because of warnings from law enforcement, customer complaints, and employees' observations both in-person and via camera.

90.

30

Defendants should have known that by failing to correct or warn of the condition at their property (i.e., allowing crime to reign freely and without consequence for the sake of profit), Plaintiff's trafficking and multiple rapes were foreseeable.

91.

Defendants knew and should have known that they had to hire security, contract police, or implement other reasonable measures (i.e., requiring I.D.s for all patrons; not allowing under an hour visits to the Motel; requiring housekeeping services every 48 hours; monitoring rooms for room traffic; and requiring employees to call the police upon suspicion of drug use or prostitution or others crimes and be trained to recognize the same).

## IV. COUNT 1: TVPRA CIVIL BENEFICIARY CLAIMS

92.

The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA") provides a civil cause of action to victims like D.H. against "[whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. . ."

93.

Defendants "knowingly benefited" from D.H's trafficking because:

a. Travis rented rooms at Defendants' Motel; and

b. Defendants collected revenue from the room rentals by accepting payment for said rooms.

94.

Defendants took part in a common undertaking involving risk or profit with the traffickers because:

31

a. Defendants directly rented rooms to Travis for which they received money and/or United States currency;

b. Defendants directly rented rooms to Travis when they knew or should have known Travis was engaged in sex trafficking Plaintiff;

c. After renting rooms to Travis, when Defendants knew or should have known Travis was engaged in sex trafficking Plaintiff, Defendants continued their business relationship with Travis by continuing to rent rooms to him;

d. Defendants had a continuous business relationship with Plaintiff's Trafficker(s) such that Defendants established a pattern of conduct with said trafficker(s);

e. After renting the room for the first night, Plaintiff's traffickers had prior commercial dealings with Defendants and then reinstated those dealings through future room rentals;

f. Defendants associated with Plaintiff's Trafficker(s) in an effort to continue Defendants' business objectives of profiting from increased room rentals;

g. Upon information and belief, Defendants steered Plaintiff's Trafficker(s) to certain areas of the hotel where its less likely they would be found by law enforcement;

h. Upon information and belief, Defendants instructed staff not to call the police about crime and criminal acts on the property;

i. Defendants owned, operated, and maintained the Charlotte Super 8 Motel in question; and

j. On every occasion Defendants rented Travis a room, it received money and/or United States currency in exchange.

95.

Plaintiff's Trafficker's undertaking with Defendants violated the TVPRA with respect to Plaintiff because:

a. Plaintiff's Trafficker forced Plaintiff to participate in commercial sex acts at Defendants' Motel by, among other reasons, hitting her, and threatening acts of violence against her;

b. Plaintiff's Trafficker kept Plaintiff under his control and in a repeated pattern of having to participate in commercial sex acts at Defendants' Motel by, among other reasons, not allowing D.H. access to money and keeping her under a cocktail of drugs;

c. Plaintiff's Trafficker harbored Plaintiff at Defendants' Motel for the purpose of Plaintiff participating in commercial sex acts at the property;

d. Travis transported Plaintiff to Defendants' Motel for the purpose of Plaintiff participating in commercial sex acts at the Motel;

e. The commercial sex acts occurred at Defendants' Motel in rooms rented by Plaintiff's Trafficker;

f. Travis used force, threats of force, fraud, and coercion to cause Plaintiff to participate in commercial sex acts at Defendants' Motel;

g. Travis threatened Plaintiff with violence and used this tactic to cause Plaintiff to engage in commercial sex acts at Defendants' Motel;

h. Travis knowingly recruited, enticed, harbored, transported, advertised, maintained, and solicited Plaintiff to engage in commercial sex acts in Defendants' Motel rooms that were rented from Defendants;

i. Buyers came to Defendants' Motel, purchased the "right" to have sex with Plaintiff from her Trafficker, and then the buyers raped Plaintiff at Defendants' Motel;

j.  Travis was aware that D.H. was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendants' Motel;

k.  Travis utilized Defendants' wireless internet connection to arrange for the commercial sex acts and post nude and under-aged photos of Plaintiff; and

l.  Other actions to be proven at trial.

96.

The venture in which Defendants participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport Plaintiff to the Motel by her trafficker (and their associates), and other reasons to be proven at trial.

97.

As shown above, Defendants had – at minimum – constructive knowledge that Plaintiff was being trafficked for sex at their Motel.

98.

Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Motel at all relevant times, giving Defendants specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at the Motel during the relevant period.

## V. COUNT 2: PREMISES LIABILITY LAW

99.

Defendants owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the Motel safe and to not negligently create and maintain the condition that caused her injury.

100.

Defendants had actual and constructive knowledge of criminal activity at the Motel that made the repeated raping of Plaintiff foreseeable to Defendants.

101.

Defendants knew or should have known of steps to take to prevent the Motel from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to correct the conditions or warn Plaintiff.

102.

Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

   a.    Failing to use ordinary care to keep the premises safe;

   b.    Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the Motel;

   c.    Negligently failing to properly inspect and maintain the premises;

   d.    Negligently failing to properly train and supervise their employees regarding sex trafficking and other sex crimes at the Motel;

   e.    Negligently failing to properly retain, hire, train, and supervise said employees;

   f.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

   g.    Negligently failing to respond to online reviews and publicly available information;

   h.    Negligently failing to prevent loitering, pandering, prostitution, and

trespassing;

i.    Negligently failing to remove loiterers, panderers, prostitutes, pimps, and trespassers;

j.    Negligently failing to inspect, patrol, or appropriately monitor the property;

k.    Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

l.    Negligently failing to remediate a long history of crime at the Motel;

m.    Negligently failing to warn invitees of known hazards at the property;

n.    Negligently representing to invitees that the property was safe; and

o.    Other negligent acts that violated North Carolina common law to be proved at trial.

103.

Defendants had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the Motel.

104.

Defendants were aware of the dangerous criminal condition at the Motel and negligently allowed that condition to continue.

105.

Defendants maintained a dangerous, criminal condition at the Motel.

## VI. CAUSATION AND DAMAGES

106.

Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendants, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

107.

As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

108.

Defendants are joint and severally liable for Plaintiff's damages: past, future, and present.

109.

Defendants are liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees under 18 U.S.C. § 1595(a) and punitive damages.

110.

Plaintiff brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

a.  Actual damages;

b.  Direct damages

c.  Personal injuries;

d.  Past, present, and future pain and suffering;

e.  Disability;

f.  Disfigurement;

g.  Mental anguish and emotional distress (until trial and in the future);

h.  Loss of the capacity for the enjoyment of life;

i.  Loss of earning capacity;

j.  Physical pain and suffering;

k.  Emotional impairment;

l.  Unjust enrichment;

m.  Penalties;

n.  Lost wages;

o.  Diminished capacity to labor;

p.  Incidental expenses;

q.  Past, present, and future medical expenses;

r.  Pre- and post-judgment interest at the maximum legal rates;

s.  Permanent injuries; Attorney's fees;

t.  Punitive damages;

u.  Exemplary Damages; and

v.  Consequential damages to be proven at trial.

## VII. JURY TRIAL

111.

Plaintiff demands a jury trial on all issues.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendants and for the following:

1)  That process and summons issue requiring each Defendant to appear as provided
    by law to answer the allegations of the Complaint;

2)     Plaintiff be awarded actual damages in amounts to be shown at trial jointly and

severally;

3)     Plaintiff be awarded all general, special, compensatory, economic, and other

allowable damages in accordance with the enlightened conscience of an impartial

jury from Defendants jointly and severally;

4)     Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)     Punitive damages be imposed upon Defendants;

7)     Plaintiff be provided with a trial by jury; and

8)     Plaintiff have such other relief as this Court deems just and appropriate under the

circumstances.

This 26th day of June 2025.

**THE STODDARD FIRM**
*/s/ Matthew B. Stoddard___*
Matthew B. Stoddard, Esq.
North Carolina Bar No. 62220
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@LegalHelpGa.com
***Attorneys for Plaintiff***